**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN CASTORINA, RENEE MEISENBACH, and LIZABETH ASVITT-OSMAN, on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| SELECT PORTFOLIO SERVICING, INC., | |
| Defendant. | |

## <u>CLASS ACTION COMPLAINT</u>

## I.    INTRODUCTION

1.    Plaintiffs John Castorina, Renee Meisenbach, and Lizabeth Asvitt-Osman (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendant Select Portfolio Servicing, Inc. ("SPS"), alleging (1) breach of contract; and violations of (2) California's Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act"), Cal. Civ. Code § 1788.14; and (3) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200.

2.    SPS is one of the last major mortgage servicers to charge residential borrowers "Pay-to-Pay Fees," *i.e.* fees for paying mortgages online or over the phone. These Pay-to-Pay Fees can be up to $15 for each payment made. In charging these fees to its residential mortgage customers, SPS violates state debt-collection and consumer protection laws.

3.    The Consumer Financial Protection Bureau ("CFPB"), the agency tasked with interpreting the federal Fair Debt Collection Practices Act, has determined this practice (charging Pay-to-Pay Fees) violates Section 1692f(1) of that statute, which prohibits loan servicers from imposing fees on payment methods unless those fees are *expressly* authorized or permitted by law. California's Rosenthal Act contains the same prohibition, and SPS's Pay-to-Pay Fees are neither *expressly* authorized nor permitted by law.

4.    No law affirmatively permits SPS to charge Pay-to-Pay Fees, and numerous state and federal governmental agencies have condemned Pay-to-Pay Fees as unfair. Borrowers cannot choose their mortgage servicer, and thus, those assigned to SPS must pay its unfair fees and cannot elect to transfer to the many other mortgage servicers that comply with the law by offering these payment methods for free.

5.    Nor are SPS's Pay-to-Pay Fees "expressly authorized" by the highly standardized residential mortgage agreements. Indeed, the vast majority of the mortgage loans serviced or

subserviced by SPS are secured by mortgage or deed of trust agreements conforming to the model mortgage documents of Fannie Mae/Freddie Mac, the Federal Housing Administration ("FHA"), and other governmental agencies (the "Uniform Mortgages"). Many of the provisions or "uniform covenants" found in the Uniform Mortgages are the same or substantially similar, including restrictions regarding the charging of fees. Not only do the Uniform Mortgages lack any express authorization of the right to charge Pay-to-Pay Fees, but they also prohibit the charging of fees that are in violation of the law. Moreover, FHA mortgage agreements explicitly limit additional fees only to those specific fees authorized by the Secretary of the U.S. Department of Housing and Urban Development ("HUD"). The Pay-to-Pay Fees are not authorized by HUD.

6.    Because mortgage servicers save money when they agree to accept payment via electronic funds transfers ("EFTs"), most mortgage servicers offer these payment methods free of charge. SPS, for its part, has long known that Pay-to-Pay Fees are illegal but charges them anyway. For example:

- SPS was informed of the illegal nature of the fees in:

  o *DeSimone v. SPS*, 1:20-cv-03837-PKC-TAM (E.D.N.Y.): Filed in July 2020, alleging violations of federal and state consumer protection laws;

  o *Washington v. SPS*, 5:20-cv-1711 (C.D. Cal.) (transferred to E.D.N.Y. and consolidated with *DeSimone* on May 27, 2021): Filed in August 2020, alleging violations of federal and state consumer protection laws;

  o *Hardnett v. SPS*, 1:24-CV-01534 (D.D.C.): Filed in May 2024, alleging violations of D.C. consumer protection laws; and

  o *Johnson v. SPS*, 3:24-CV-01583 (D. Or.): Filed in September 2024, alleging violations of Oregon consumer protection laws.

- SPS was further informed of the illegal nature of the fees via a 2017 bulletin from the CFPB alerting mortgage servicers that the practice violates the Fair Debt Collection Practices Act (15 U.S.C. § 1692f1).

- SPS was under an order by the Federal Trade Commission ("FTC") not to charge fees unless they were "reasonable" and otherwise complied with state and federal law. SPS knew that its Pay-to-Pay Fees were not reasonable, as those fees were many times higher than SPS's out of pocket costs, and of those loan servicers charging Pay-to-Pay Fees, SPS's fees were at the highest end of the range.

- SPS has been aware for many years of successful lawsuits filed against its competitors for charging Pay-to-Pay Fees and the positions of the federal and state regulators.

7.      As a loan servicer, SPS is compensated by the creditor for collecting borrowers' monthly payments—its profits are not supposed to arise from additional "service" fees untethered to the cost to SPS of providing such services. In violation of state consumer protection laws, SPS marks-up its costs of processing loan payments online or by phone above the actual cost and imposes Pay-to-Pay Fees on borrowers to create a profit for itself.

8.      Upon information and belief, the actual cost for SPS to process mortgage payments made online or by phone is very low—well below the Pay-to-Pay Fees that SPS charges mortgagors. SPS pockets the difference as pure profit.

9.      Plaintiffs John Castorina, Renee Meisenbach, and Lizabeth Asvitt-Osman paid these Pay-to-Pay Fees and bring this class action lawsuit individually and on behalf of all similarly situated putative class members to recover the unlawfully charged Pay-to-Pay Fees and to enjoin SPS from continuing to charge these unlawful fees.

## II.    THE PARTIES

10.    Plaintiff Castorina is a citizen and resident of the State of California, residing in Sacramento County. During the Class Period and continuing to the present, Plaintiff Castorina was a borrower mortgagor to a mortgage loan for the home in which he lives. SPS serviced his mortgage and charged him Pay-to-Pay Fees during the Class Period. For example, on several occasions in 2020, 2021, and 2022, SPS charged Mr. Castorina Pay-to-Pay Fees between $5.00 and $15.00 for making loan payments over the phone or online. Plaintiff Castorina's mortgage agreement is attached hereto as **Exhibit A**.

11.    Plaintiff Meisenbach is a citizen and resident of the State of California, residing in Placer County. During the Class Period and continuing to the present, Plaintiff Meisenbach was a borrower mortgagor to a mortgage loan for the home in which she lives. SPS serviced her mortgage and charged her Pay-to-Pay Fees during the Class Period. For example, on several occasions in 2021 and 2022 SPS charged Ms. Meisenbach a Pay-to-Pay Fee for requesting payments online. On each occasion, the amount of the fee imposed by SPS was $15.00. Plaintiff Meisenbach's mortgage agreement is attached hereto as **Exhibit B**.

12.    Plaintiff Asvitt-Osman is a citizen and resident of the State of California, residing in Sonoma County. During the Class Period and continuing to the present, Plaintiff Asvitt-Osman was a borrower mortgagor to a mortgage loan for the home in which she lives. SPS serviced her mortgage and charged her Pay-to-Pay Fees during the Class Period. For example, on February 14, 2022, SPS charged Ms. Asvitt-Osman a $15.00 Pay-to-Pay Fee for requesting a payment online. Plaintiff Asvitt-Osman's mortgage agreement is attached hereto as **Exhibit C.**

13.    SPS is a residential loan servicing company with headquarters located at 3217 S. Decker Lake Drive, Salt Lake City, Utah 84119. SPS is authorized to do business by the New York Secretary of State and is licensed by the State of New York as a Mortgage Servicer and Mortgage

Servicer Branch. SPS services hundreds of thousands of loans and generally services distressed loans.

### III.    JURISDICTION AND VENUE

14.    This Court has diversity jurisdiction over all state and common law claims, including the state statutory and common law claims, pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of Title 28 of the United States Code).

15.    Plaintiffs are citizens of different states than Defendant, which is a citizen of Utah. Plaintiffs are citizens of California.

16.    The  amount in controversy exceeds $5,000,000 and there are at least one hundred members of the Proposed Class. *See* 28 U.S.C. §§ 1332(d)(2) & (d)(6).

17.    This Court has personal jurisdiction over SPS because it is a foreign corporation authorized to conduct business in New York, it regularly does business in New York, has sufficient minimum contacts with New York, and otherwise intentionally avails itself of the New York financial, real estate, and consumer markets. This purposeful availment renders the exercise of jurisdiction by this Court over SPS permissible under traditional notions of fair play and substantial justice.

18.    This Court has personal jurisdiction over Plaintiffs and their claims under California law because SPS previously consented to personal jurisdiction over California plaintiffs and claims under California law in the Eastern District of New York when the court consolidated *DeSimone v. Select Portfolio Servicing, Inc.*, 1:20-cv-03837 (E.D.N.Y.), with *Washington v. Select Portfolio Servicing, Inc.*, 5:20-cv-1711 (C.D. Cal.). Pursuant to a stipulation endorsed by the then-presiding judge in the U.S. District Court for the Central District of California, plaintiff Washington and SPS agreed to transfer the *Washington* action to this District, and accordingly,

SPS agreed jurisdiction was proper. *See* Stipulation to Transfer Case to the Eastern District of New York, *Washington v. Select Portfolio Servicing, Inc.*, 5:20-cv-1711 (C.D. Cal. May 24, 2021), ECF No. 41.

19.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391(b)(3) because SPS is subject to the court's personal jurisdiction as it regularly transacts business and may be found in this District.

20.     Venue is further appropriate in this District because this action is related to the action pending in this Court styled, *DeSimone v. Select Portfolio Servicing, Inc.*, 1:20-cv-03837 (E.D.N.Y.).

## IV.     STATEMENT OF FACTS

**A.     SPS is retained by mortgage lenders to service and collect mortgage debt.**

21.     SPS is a loan servicer and sub-servicer that operates around the country. SPS buys mortgage servicing rights or contracts to sub-service mortgage servicing with a primary servicer and exercises those mortgage servicing rights to collect mortgage payments, charge authorized fees, enforce the mortgage or deed of trust and Note, and initiate foreclosure on properties that secure the mortgage or deed of trust and Note. SPS does not disclose the terms of its servicing agreements publicly.

22.     SPS enters into service agreements with lenders, primary servicers, note holders, and trustees pursuant to which SPS provides servicing, subservicing, and agency activities for loan portfolios. In accordance with those agreements, SPS is compensated by the lenders, note holders, and trustees to act as their agent and to exercise their rights and responsibilities pursuant to their approval. SPS either takes assignment of the servicing obligations in borrowers' loan agreements and/or is in functional privity and/or near privity of contract with Plaintiffs and Class Members,

tasked with performing many of the obligations assumed by the lenders to Plaintiffs' and Class Members' loan agreements.

1. **Overview of the Mortgage Industry and Its Standardized Lending Practices**

23.     The residential mortgage lending industry is generally divided between two types of loans. The vast majority of loans are "conforming" loans that "conform" with particular uniform terms, conditions, and amounts under a certain threshold set by the Federal Housing Finance Agency in coordination with Federal National Mortgage Association ("FNMA" or "Fannie Mae") and the Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"). FNMA and FHLMC are federally chartered corporations and are known as Government-Sponsored Enterprises ("GSEs"). In 2021, that funding threshold was $528,250 in many places, and up to $970,800 in higher cost-of-living areas. Loans that do not conform to these standards are typically "jumbo" loans and require more specialized underwriting due to the higher value of the property securing the mortgage.

24.     Conforming loans include both government loans (*i.e.*, those insured by the Federal Housing Administration, Veterans' Administration, or the U.S. Department of Agriculture), and conventional loans. Conforming loans must "conform" to the nationwide standards set by the GSEs, which purchase them to sell as pooled securities in the secondary market. To ensure ease of securitization, the GSEs create standard mortgage and deed of trust templates for all conventional loans, and the government agencies' templates are modeled after those GSE templates. While these templates contain sections for language that incorporates state requirements, this process too contains standardized language.

25.     Because the conforming lending process depends on standardization, all borrowers go through the same process to obtain a conforming loan. Mortgage lenders typically use industry

software to generate the standardized templates and complete the templates with the borrowers' information. Once approved to borrow the funds, the borrowers execute these standard loan documents. Because the GSEs will accept for securitization only those loans that adhere to their standard loan documents, a lender cannot add additional terms and there is no room for negotiation of any kind.

26.    After the mortgage or deed of trust agreement is finalized, the mortgage lender often sells the mortgage loan to the GSEs, who in turn bundle that mortgage loan with other conforming loans to sell as securities to investors in the form of a mortgage-backed security — bond-like securities that are secured by the homes. While the original mortgage lender may remain to service the securitized and pooled loan, the primary servicer or GSE often retains another servicer or sub-servicer (such as SPS) that specializes in the actual management and administration of mortgages to perform the servicing obligations required by the Uniform Mortgages.

> **2.    Mortgage lenders and note holders retain mortgage servicers like SPS to accept payments and collect mortgage debt from borrowers.**

27.    As part of the contractual or assignment process, the mortgage servicer or sub-servicer and the lender or GSE negotiate a fee schedule to compensate the mortgage servicer or sub-servicer for collecting payments and other servicing and collections work. The borrower has no role in this process.

28.    The fees paid to mortgage servicers or sub-servicers by the lender or GSE come in a variety of forms. First, mortgage servicers or sub-servicers negotiate a servicing fee, which is typically a percentage of approximately 0.25-0.5% of a borrower's outstanding mortgage balance on an annual basis. The average balance on a mortgage loan in this country is $208,000. Thus, if a mortgage servicer agrees to perform work for 0.5% of the borrowers' balance, and a borrower has a $208,000 balance on the mortgage, the servicer will receive $1,040 a year, or $86.67 a month

to accept the payment from the borrower and apply it to the balance. The servicing agreement between the servicer or sub-servicer and lender or GSE also includes other fee schedules negotiated between those contracting parties and may include things like allowing the holder of the mortgage loans to retain late fees (capped by the GSE and set in the standardized loan templates) and the ability to retain interest on borrowers' escrow payments.

29.    Consumer borrowers have no say in who their designated loan servicers will be. Nor are they required to pay for loan servicing beyond paying their mortgage and agreed interest.

**3.    SPS is a debt collector because it collects and services mortgage debt.**

30.    SPS works in interstate commerce, collecting mortgage debt from borrowers nationwide from its headquarters in Utah. It is registered and licensed as a mortgage servicer, collection agency, debt collector, or similar in states around the country.[1] It is retained by GSEs, note holders, and lenders to collect on mortgage debt pursuant to the terms of the Uniform Mortgages, which contemplate monthly payments (payable on the first of every month). Thus, it is engaged in the regular collection of debt from residential mortgage borrowers.

31.    SPS represents in standard, form letters to Plaintiffs and other borrowers that, "[a]s the mortgage servicer, SPS is authorized to collect all payments and administer the terms of the note and security instrument." SPS mails standard, form mortgage statements and notice letters to Plaintiffs and Class Members with the approval and authority of its lender, note holder, and/or trustee principals.

32.    As part of SPS's regular business practice of acquiring servicing rights to mortgages, it acquires mortgages in default for purposes of servicing them, including collecting

---

[1] SPS, List of State Licenses, https://www.spservicing.com/Content/pdf/SPSLicenseList.pdf (last accessed Jan. 16, 2025).

payments on that mortgage debt both during the time the mortgage is in default and after the mortgage is made current.

33.    In a September 2024 decision on SPS's motion to dismiss in *DeSimone v. Select Portfolio Servicing, Inc.*, Judge Chen held that SPS is a debt collector under the FDCPA. 20-CV-3837, 2024 WL 418851, at *11-12 (E.D.N.Y. Sept. 13, 2024).

> **4.    Mortgage servicers like SPS increase profits when borrowers submit payments electronically rather than through the mail.**

34.    Uniform Mortgages contemplate the monthly payment of mortgages by check or other electronic payment methods. Payments by check can cost loan servicers like SPS anywhere between $1 and $4 a month in processing and other fees, per a 2015 report by the Association for Financial Professionals.[2] Every check needs to be opened, reviewed, keyed into the computer system to apply to the loan, and deposited. Delays in postal operations and the high risk of human error generate customer service calls, requiring internal checkpoints and increased oversight. Borrowers who are concerned about the timeliness of the payment may call to ensure it was received and properly credited, adding to the customer service work associated with this routine part of servicing. Because it is so expensive to process check transactions, every mortgage servicer in the country offers borrowers the option of having their monthly payment automatically debited via the ACH system. While offered under the auspice of improving services for borrowers, the cost of an ACH transaction is typically only a few cents, and its electronic nature reduces overhead costs enormously.

---

[2] Association for Financial Professionals, "2015 Payments Cost Benchmarking Survey: Report of Survey Results," https://www.afponline.org/docs/default-source/default-document-library/pub/2015-payments-cost-benchmarking-report.pdf?sfvrsn=6c7f466b_2 (last accessed Jan. 15, 2025).

35.     Still, for many borrowers, the automatic ACH system is impractical as it requires a borrower to agree to a fixed amount and date for the debit each month out of a pre-determined bank account and increases a borrower's vulnerability to banking errors. Borrowers may have budgetary needs or personal preferences that cause them to want more control over their finances. Some may wish to choose their payment method on a monthly basis. Others may be sharing responsibility for paying the mortgage with another person, and funds to pay it come from multiple bank accounts.

36.     To reduce the expense caused by borrowers who pay as required but prefer more control over their payments than the automatic ACH option provides, many servicers offer borrowers the option to pay by phone or online. This option typically costs servicers less than 50 cents a transaction, far less than the cost of paying by check, and, like the automatic ACH method, includes increased electronic efficiencies.

37.     Because the cost savings is so significant, most mortgage servicing companies, as well as third-party debt collectors, allow consumers to make their mortgage payments over the phone or online, and many loan servicers offer these services for free. While phone and online payment methods are marketed as convenient for consumers, they are more cost-effective for the servicers than payment by paper checks. Thus, mortgage servicers find their profits increase substantially by simply increasing choices to customers.

38.     Each time a borrower whose loan is serviced by SPS makes a payment over the phone or online, SPS charges the borrower a Pay-to-Pay Fee of up to $15.00.

39.     These Pay-to-Pay Fees are materially higher than the costs incurred by SPS, can add up to hundreds of dollars over the life of a single loan, and provide millions of dollars in profits to SPS. Typically, a loan servicer will use a vendor to process transactions; these third-party

vendors, such as Western Union and ACI Worldwide, charge other loan servicers $0.50 or less per internet or phone transaction. The Association for Financial Professionals' 2015 report stated that the median cost for processing these transactions was between 37 and 75 cents, much less than its estimated check processing costs of $1 to $4.[3]

40.     SPS's imposition of Pay-to-Pay Fees also amounts to double-charging. To build on the example in Paragraph 28 above, where SPS hypothetically negotiated a 0.5% servicing fee, SPS agreed to receive that rate regardless of how the borrower elects to pay, knowing that it was obligated to accept payments via check from every borrower. Thus, out of the $86.67 it receives each month out of the loan payment being made by the borrower, it could incur as much as $4 in costs to process check payments, leaving $82.67 to cover other overhead costs and for its profit. SPS double charges borrowers by charging additional Pay-to-Pay Fees, up to $15 for each phone or online payment, over and above SPS's negotiated servicing fees agreed with the lender, GSE or primary servicer. Even if the fee were to cover the cost of accepting payments (it does not, because the fees far exceed the costs), it should be included in SPS's loan servicing fee with the lender, not an additional expense passed onto borrowers.

41.     SPS purports to provide a valuable service to borrowers to which they would not otherwise be entitled. But many mortgage loan servicers offer online and phone payments for free because of the cost savings to them when borrowers pay via these methods as opposed to by paper check. Thus, providing the service is not contingent on being able to charge for the service. Further, borrowers already pay SPS to service their loans by paying their mortgages. If SPS wants to make more money, it can negotiate a larger fee from the lender, primary servicer, or GSE. It should not

---

[3] *See* n.2, *supra*.

be permitted to double dip—pocketing the servicing cut, while up-charging borrowers for the same work.

42.    The Pay-to-Pay Fees materially exceed the costs incurred by SPS to process the phone and online payments, providing millions of dollars in unlawful profits for SPS.

43.    SPS gets away with these illegal Pay-to-Pay Fees because borrowers cannot choose another mortgage servicer or shop around for a better deal. Borrowers are forced to have SPS service their loan.

**B.    SPS's practice of charging Pay-to-Pay Fees is illegal and unfair.**

**1.    The Rosenthal Act prohibits SPS from charging these Fees.**

44.    California's Rosenthal Act is a remedial statute that should be interpreted broadly to effectuate its purpose.

45.    The Rosenthal Act defines "debt collector" as "any person who, in the ordinary course of business, regularly, on behalf of that person or others, engages in debt collection." Cal. Civ. Code § 1788.2(c).

46.    The Rosenthal Act defines a "consumer debt" as "money, property, or their equivalent, due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction." Cal. Civ. Code § 1788.2(f).

47.    The Rosenthal Act defines "consumer credit transaction" as "a transaction between a natural person and another person in which property, services, or money is acquired on credit by that natural person from the person primarily for personal, family, or household purposes." Cal. Civ. Code § 1788.2(e).

48.    The Rosenthal Act prohibits, "[c]ollecting or attempting to collect from the debtor the whole or any part of the debt collector's fee or charge for services rendered, or other expense

incurred by the debt collector in the collection of the covered debt, except as permitted by law."
Cal. Civ. Code § 1788.14(b).

49.    Pay-to-Pay Fees are fees for a service offered by the debt collector.

> **a.    Pay-to-Pay Fees are not "expressly authorized by the agreement creating the debt,"** *i.e.,* **the uniform mortgage agreements.**

50.    SPS collects Pay-to-Pay Fees even though such fees are not authorized under Uniform Mortgages and it therefore has no right to collect them.

51.    For all borrowers, the agreement creating the debt is the Note secured by the Uniform Mortgages, which incorporate standard language from Fannie Mae and Freddie Mac model mortgages. The Uniform Mortgages do not contain any language that "expressly authorizes" the assessment of Pay-to-Pay Fees. *See, e.g.,* **Exs. A, B,** and **C**.

52.    The Uniform Mortgages also prohibit the assessment of fees prohibited by law. Like other Uniform Mortgages, Plaintiffs' Uniform Mortgages provide that the lender and its agents (including SPS), may not charge any borrower (including Plaintiffs) fees not approved in the Uniform Mortgages*,* which incorporate the restrictions imposed by federal law and the law where the property is located. In Plaintiffs' case, that state law is California law.

53.    Section 14 of Plaintiffs Meisenbach's and Asvitt-Osman's Uniform Mortgages provide:

> **14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. *Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law*. [Emphasis added].

*See* **Exs. B, C**.

54.    Section 16 of Plaintiffs Meisenbach's and Asvitt-Osman's Uniform Mortgages provide:

> **16. Governing Law; Severability; Rules of Construction.** *This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.* All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or of the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. [Emphasis added].

*See* **Exs. B, C**.

55.    "Applicable Law" is defined in Plaintiffs Meisenbach's and Asvitt-Osman's Uniform Mortgages at page 2, definition (J) as: "all controlling applicable federal, state and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions." *Id.*

56.    Plaintiff Castorina's Uniform Mortgage is based on the FHA model.

57.    Section 8 of Plaintiff Castorina's Uniform Mortgage provides: "Lender may collect fees and charges authorized by the Secretary [of Housing and Urban Development]." *See* **Ex. A** at ¶ 8.

58.    This provision incorporates by reference HUD's limits on allowable fees.

59.    The HUD Handbook establishes what fees and charges are authorized by the HUD. *See* HUD Handbook 4000.1 § III(A)(1)(f) ("Servicing Fees and Charges"), *Single Family Housing Policy*, https://www.hud.gov/sites/dfiles/OCHCO/documents/40001-hsgh-update16.pdf (last accessed Jan. 16, 2025).

60.    Appendix 3.0 of the HUD Handbook contains an exhaustive list of the servicing fees and charges authorized by HUD and the maximum amounts that may be charged for such fee. *Id.*

61.    Pay-to-Pay Fees are not on that list.

62.    Plaintiffs Meisenbach's and Asvitt-Osman's Uniform Mortgages prohibit the assessment of fees that are prohibited California laws, and Plaintiff Castorina's FHA Uniform Mortgage prohibits the assessment of fees that are not authorized by HUD. Accordingly, the Uniform Mortgages do not "expressly permit" the assessment of Pay-to-Pay Fees.

**b.    Pay-to-Pay Fees are not "permitted by law" and are prohibited by a court order and servicing guidelines.**

63.    There are no laws that affirmatively permit SPS to charge Pay-to-Pay Fees.

64.    SPS's predecessor reached a Consent Order[4] with the FTC following a lawsuit based on, *inter alia*, deceptive and unfair fee practices. *United States v. Fairbanks Capital Corp.*, 1:03-cv-12219 (D. Mass.), ECF 6. The FTC Order does not authorize Pay-to-Pay Fees. Instead, it *permanently enjoined* SPS from violating section 1692f(1) of the FDCPA, stating that SPS was prohibited from "[u]sing any unfair means to collect or attempt to collect a debt, including, but not limited to, collecting amounts (including any interest, fee, charge, or expense incidental to the principal obligation) not *authorized by the agreement creating the debt or permitted by law*, in violation of Section 808(1) of the FDCPA, 15 U.S.C. § 1692f1." *Id.* at 13. (emphasis added).

---

[4] Plaintiffs Meisenbach's and Asvitt-Osman's Uniform Mortgages define "applicable law" to include "administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions." The Consent Order is not an "administrative rule or order," nor is it a "final, non-appealable judicial opinion." It is a stipulated order which has been modified since it was entered.

65.     Moreover, the FTC Order states that "nothing in this Order shall permit [SPS] to impose any fee or take any other action that is prohibited by any state or federal law or regulation." *Id.* at 12.

66.     SPS's collection of Pay-to-Pay Fees is also in violation of industry standard servicing guidelines. Fannie Mae and Freddie Mac assign servicing rights with restrictions on the fees that a loan servicer may charge. Every loan servicing assignment from Fannie Mae or Freddie Mac is made under the restrictions of Fannie Mae Guidelines for Single Family Loans (the "Guidelines"). The Guidelines prohibit Pay-to-Pay Fees as an illegal fee for "facilitating routine borrower collections" and, even if the Guidelines allowed a fee, SPS must keep written policies that explain how the amount of the fee relates to the actual cost of providing the service. Considering the low cost of the service, SPS's Pay-to-Pay Fee amounts are unrelated to the actual cost of providing the service of accepting payment over the phone or online from borrowers.

### 2.     California's UCL prohibits Pay-to-Pay Fees.

67.     The California UCL defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

68.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

### 3.     SPS's Pay-to-Pay Fees are oppressive, substantially injurious to consumers, and violate public policy.

69.     As discussed herein, Pay-to-Pay Fees have earned condemnation from borrowers, federal and state legislatures, regulators, and attorneys general. Because of this, SPS is one of a dwindling minority of mortgage servicers still charging them.

70.     The federal government and state governments have issued statements condemning Pay-to-Pay Fees and prohibiting loan servicers and debt collectors from assessing them.

71.     In October 2022, President Biden announced that his administration would be taking steps to go after unfair "junk fees," such as Pay-to-Pay Fees. Around that time, the FTC announced that it was seeking comments on "junk fees," the "unnecessary, unavoidable, or surprise charges that inflate costs while adding little to no value." https://www.ftc.gov/news-events/news/press-releases/2022/10/federal-trade-commission-explores-rule-cracking-down-junk-fees (last accessed Jan. 16, 2025). Among the junk fees on which the FTC sought commentary were those imposed on "captive consumers," such as those who are dealing with companies that have "exclusive rights." *Id.* Chair Lina M. Khan explained that:

> No one has ever felt that a 'convenience fee' was convenient. Companies should compete to provide the best quality at the best price, not to see who can squeeze the most added expenses out of consumers. That's especially true at a time when families are struggling with the effects of inflation.

*Id.*

72.     The CFPB has taken steps to address junk fees like Pay-to-Pay Fees. In June 2022, it issued an advisory opinion in which it "affirm[ed]" its position that the imposition of "pay-to-pay or 'convenience' fees—such as fees imposed for making a payment online or by phone," where those fees are not contractually or legally authorized—is an "unfair or unconscionable means to collect or attempt to collect any debt" prohibited by Section 808(1) of the FDCPA and the CFPB's regulations implementing that provision. CFPB, Advisory Opinion, https://files.consumerfinance.gov/f/documents/cfpb_convenience-fees_advisory-opinion_2022-06.pdf (last accessed Jan. 16, 2025).

73.     This advisory opinion comes on the heels of other efforts by the CFPB to respond to the problems caused by Pay-to-Pay Fees. In October 2021, the CFPB, filed an *amicus* brief in a matter before the Ninth Circuit agreeing that the FDCPA prohibits the charging of any amount not

expressly authorized by the agreement creating the debt or otherwise affirmatively permitted by state law. The CFPB explained:

> The FDCPA was designed to rein in unethical debt collectors, and Section 1692f(1) specifically was designed to limit the amounts that debt collectors could try to collect from consumers. But under the district court's interpretation, debt collectors can collect additional fees, like the pay-to-pay fees at issue here, whenever no other law specifically prohibits them—leaving debt collectors with the power and discretion to try to collect additional fees during the collection process. This is particularly problematic given that consumers have no ability to shop around for a better deal. And it's not as if these pay-to-pay fees are necessary for debt collectors to offer phone or online payment options that consumers might want, as it is generally cheaper for collectors to accept payment by phone or online than to accept payment by mail (which is typically the fee-free option). Pay-to-pay fees are thus most often just a way for debt collectors to take advantage of consumers by trying to extract more money than they originally bargained for or reasonably expected to pay.

*Thomas-Lawson v. Carrington Mort. Servs.*, 9th Cir. No. 21-55459, Dkt. 22 (*Brief of Amicus Curiae Consumer Financial Protection Bureau in Support of Plaintiffs-Appellants*) at 11.

74.    The CFPB 's position on Pay-to-Pay Fees is not new. In 2017, the CFPB put out a bulletin on "Phone Pay Fees," in which it warned financial services providers and debt collectors about the many ways in which their fees for making payments over the phone could violate laws. In the bulletin, the CFPB expressly warned mortgage servicers that this practice might violate the FDCPA, stating:

> Supervision has found that one or more mortgage servicers that met the definition of "debt collector" under the FDCPA violated the Act when they charged fees for taking mortgage payments over the phone to borrowers whose mortgage instruments did not expressly authorize collecting such fees and who reside in states where applicable law does not expressly permit collecting such fees. Supervision directed one or more servicers to review mortgage notes and applicable state law, and to only collect pay-by-phone fees where expressly authorized by contract or state law.

https://files.consumerfinance.gov/f/documents/201707_cfpb_compliance-bulletin-phone-pay-

fee.pdf ("CFPB 2017 Bulletin") (last accessed Jan. 16, 2025).

75.    State regulators have also taken action. In April 2022, in response to the CFPB's request for information on this issue, the attorneys general of New York and California joined a coalition of 22 state attorneys general, including New York, to call on the CFPB to prohibit mortgage servicers from charging Pay-to-Pay Fees. https://ag.hawaii.gov/wp-content/uploads/2022/04/State-Attorneys-General-Multistate-Comment-Letter-to-CFPB_convenience-fees_4.11.22_final.pdf (last accessed Jan. 16, 2025). The group submitted comments solely on the Pay-to-Pay Fees charged by mortgage servicers. The state attorneys general noted that Pay-to-Pay Fees are particularly problematic, explaining: "since mortgage borrowers are a captive market for their particular servicer, borrowers can't simply avoid the fees by taking their business elsewhere." *Id.* at 2.

76.    Similarly, in 2021, a coalition of 33 state attorneys general, including those representing California, intervened to object to a settlement with another large mortgage servicer, when the terms of that agreement purported to permit the servicer to force borrowers to modify their Uniform Mortgages to allow it to assess Pay-to-Pay Fees. The New York Attorney General, speaking for the coalition, condemned the fees as unlawful:

> "When Americans utilize online or phone payments to pay off their monthly mortgages, [mortgage servicer] PHH benefits, but instead of passing those savings on to homeowners PHH charged illegal fees and increased costs for nearly one million Americans," said Attorney General James. "PHH's sole purpose is to collect and process homeowners' payments, which it already makes millions of dollars from each year. In the 21st century, when most Americans pay their bills online or by phone, to charge fees on top of what they are already being paid is not only unethical, but unlawful. . . .
>
> For years, PHH charged nearly one million homeowners an illegal fee — ranging from $7.50 to $17.50 — each time a homeowner made a monthly mortgage payment online or by phone, despite most Americans paying their mortgages one of these two ways. Nowhere in these homeowners' mortgage contracts is there authorization for

> such fees and PHH does not charge "processing" fees for any other customers, including those who pay by check or those who set up automatic debit payments. Charging fees not mentioned in the mortgage contract is illegal and, under New York's mortgage servicing regulations, explicitly forbidden.

New York State Attorney General, "Attorney General James Leads Bipartisan Coalition Fighting to Protect Nearly One Million Homeowners from Unlawful Fees" (Jan. 29, 2021), https://ag.ny.gov/press-release/2021/attorney-general-james-leads-bipartisan-coalition-fighting-protect-nearly-one.

77.    In the past decade, New York's Department of Financial Services has entered into five consent orders or agreements with lenders charging unlawful Pay-to-Pay Fees.[5]

**4.    SPS has long known that its Pay-to-Pay Fees violate contracts, laws, and public policy but forces borrowers to pay them anyway.**

78.    SPS is well aware that it has been engaging in illegal and unfair conduct but has refused to stop.

**a.    Plaintiffs provided SPS with pre-suit notice even though pre-suit notice is not required to plead statutory violations.**

79.    On December 30, 2024, Plaintiffs Castorina, Meisenbach, and Asvitt-Osman provided written, pre-suit notice to SPS sufficient to put SPS on notice of the claims alleged in this action, including breach of contract.

80.    SPS did not respond substantively to these complaints nor cure the noticed violations.

81.    Even though Plaintiffs provided pre-suit notice to SPS, it was and remains unnecessary to provide SPS with pre-suit notice to litigate its violations of state statutes. Those

---

[5] *See* Consent Order to Ocwen Financial Corporation, Ocwen Loan Servicing LLC for the following dates: March 27, 2017, Dec. 22, 2014, Dec. 5, 2012, and Dec. 15, 2011, available at https://www.dfs.ny.gov/industry_guidance/enforcement_actions_mortgage.

claims are premised on violation of rights provided by statute, not SPS's breach of Plaintiffs' and Class Members' mortgage agreements or deeds of trust.

82. Nowhere in California's Rosenthal Act nor its UCL are parties permitted to contract around substantive rights. Nor do these laws permit loan servicers or debt collectors to unilaterally impose additional hurdles to borrowers who seek their protection.

>    **b.    Further pre-suit notice would be futile given SPS's multi-year willful defiance of federal and state laws, against the backdrop of its inadequate internal controls.**

83. In addition to the pre-suit notices provided by Plaintiffs discussed above, SPS has long been aware that its assessment of Pay-to-Pay Fees is illegal but has refused to make modifications.

84. SPS was aware of state and federal regulators statements and positions on Pay-to-Pay Fees. Indeed, as a mortgage servicer, SPS would have received and read the 2017 CFPB Bulletin referenced *supra* and been on notice that its Pay-to-Pay Fees were illegal and violated the FDCPA. SPS would also be aware of the various statements and actions by regulators described in Section IV.B.3.

85. SPS was also on notice via the FTC Order of its legal obligations with respect to the fees assessed to mortgage borrowers. Nevertheless, it continued to charge unreasonable fees not expressly permitted by borrowers' agreements creating the debt nor any other law.

86. In addition, SPS has been sued by borrowers in multiple states over its Pay-to-Pay practices. For example, in August 2020, several borrowers filed two lawsuits alleging SPS's Pay-to-Pay practices violated the FDCPA as well as other state laws; those cases were consolidated, and the action is still ongoing in this District. *See generally DeSimone et al v. Select Portfolio Servicing, Inc.*, 1:20-cv-03837 (E.D.N.Y.). In addition, SPS was sued by borrowers in the District of Columbia (*Hardnett v. Select Portfolio Servicing, Inc.*, 1:24-CV-01534 (D.D.C.)) and Oregon

(*Johnson v. Select Portfolio Servicing, Inc.*, 3:24-CV-01583 (D. Or.)) over its Pay-to-Pay practices. Each of those cases alleged the Pay-to-Pay Fees violated state consumer protection laws.

87.    Moreover, by virtue of its role as a mortgage servicer, SPS would have been aware of the many lawsuits against mortgage loan servicers over the charging of Pay-to-Pay Fees. Over the last nine years, numerous relevant class action lawsuits have been filed against nearly every major mortgage loan servicer in multiple states, including Nationstar Mortgage LLC, Ocwen Loan Servicing, LoanCare LLC, and Caliber Home Loans.

88.    For example, prior to Plaintiffs bringing suit, SPS would have been aware of the following settlements with major loan servicers over their Pay-to-Pay Fee practices:

- *Garcia v. Nationstar Mortgage*, *LLC*, 2:15-cv-1808 (W.D. Washington): Filed in 2015, this lawsuit alleged that Nationstar Mortgage violated the FDCPA and Washington state law when it collected Pay-to-Pay Fees from mortgage borrowers. It settled in May 2018.

- *McWhorter v. Ocwen Loan Servicing, LLC*, 2:15-cv-1831 (N.D. Ala.): Filed in 2015, this lawsuit alleged that Ocwen Loan Servicing violated the FDCPA when it collected Pay-to-Pay Fees from mortgage borrowers. It settled in 2019.

- *Sanders v. LoanCare, LLC*, 2:18-cv-09376 (C.D. Cal): Filed in 2018, this lawsuit alleged that LoanCare, LLC violated California law when it collected Pay-to-Pay Fees from mortgage borrowers. It settled in 2019.

- *Silveira v. M&T Bank*, 2:19-cv-06958 (C.D. Cal): Filed in 2019, this lawsuit alleged that M&T Bank violated California law when it collected Pay-to-Pay Fees from mortgage borrowers. It settled in 2022.

- *Montesi v. Seterus Bank*, 2015-CA-010910 (Fla. Cir. Ct): Filed in 2015, this lawsuit alleged that Seterus violated Florida law when it collected Pay-to-Pay Fees from mortgage borrowers. It settled in 2019.

89.    Moreover, SPS would have known that other mortgage servicers were currently litigating lawsuits over Pay-to-Pay Fees, including:

- Carrington Mortgage Services (at least five lawsuits, including two in the Southern District of Florida, one in the District of Maryland, one in Central District of California, and one in California's Orange County Superior Court);

- Roundpoint Mortgage Servicing (lawsuit filed in the Northern District of California);

- Caliber Home Loans (three lawsuits filed in District of Minnesota, Middle District of North Carolina, and Southern District of Texas);

- Rushmore Loan Management Services (lawsuit filed in California's Orange County Superior Court);

- Freedom Mortgage Corporation (lawsuit filed in Northern District of Texas);

- Arvest Central Mortgage Co. (lawsuits filed in Northern District of California; District of Arkansas, and Southern District of Florida).

90.    Since plaintiffs in *DeSimone* filed their lawsuit in August 2020, each of the aforementioned mortgage companies have stopped charging Pay-to-Pay Fees and provided settlements to affected borrowers.

91.    At the time Plaintiffs provided pre-suit notice and subsequently filed this lawsuit, SPS had been notified that its practice of charging Pay-to-Pay Fees violated state and federal laws and violated all other legal duties and obligations. SPS had been informed not only by Plaintiffs

but had extensive information available to it via its role as a servicer to understand the full extent of the illegality of its fee practices. SPS nevertheless declined to cure.

92.     Given SPS's multi-year refusal to cure, additional pre-suit notice from Plaintiffs would be futile and would stand as an unreasonable barrier to the enforcement of their contractual and statutory rights.

93.     In a September 2024 decision on SPS's motion to dismiss in *DeSimone v. SPS*, Judge Chen held on similar facts that additional pre-suit notice to SPS would be futile. 20-CV-3837, 2024 WL 418851, at *11-12 (E.D.N.Y. Sept. 13, 2024).

**C.     Plaintiffs' Allegations**

**1.     SPS charged Plaintiff Castorina Pay-to-Pay Fees.**

94.     Plaintiff Castorina owns property in California that is secured by a mortgage and deed of trust, dated April 17, 1995, attached hereto as **Exhibit A**. Plaintiff Castorina's Uniform Mortgage incorporates standard language from FHA model mortgages and is for his personal residence.

95.     SPS serviced Mr. Castorina's mortgage during the Class Period.

96.     Mr. Castorina made his mortgage payments to SPS over the phone or online. When he did so, SPS charged him a Pay-to-Pay Fee. For example, on several occasions in 2020, 2021, and 2022, SPS charged Mr. Castorina Pay-to-Pay Fees between $5.00 and $15.00 per payment over the phone or online.

97.     On December 30, 2024, prior to filing this Complaint, Mr. Castorina made a written pre-suit demand upon SPS on behalf of similarly situated borrowers, mailing it by first class mail. Specifically, Mr. Castorina informed SPS that the additional service fee charged is neither fair nor right and requested that SPS refund the extra fees collected on a class-wide basis. SPS was given a reasonable opportunity to cure the breaches complained of herein but has failed to do so.

98.     Despite receiving this notice, SPS has refused to remedy its violations as to Mr. Castorina and Class Members. Further notice would be futile.

**2.      SPS charged Plaintiff Meisenbach Pay-to-Pay Fees.**

99.     Plaintiff Meisenbach owns property in California that is secured by a mortgage and deed of trust, dated March 10, 2022, attached hereto as **Exhibit B**. Plaintiff Meisenbach's Uniform Mortgage incorporates standard language from Fannie Mae model mortgages and is for her personal residence.

100.    SPS serviced Plaintiff Meisenbach's mortgage during the Class Period.

101.    Ms. Meisenbach made her mortgage payments to SPS over the phone or online. When she did so, SPS charged her a Pay-to-Pay Fee. For example, on several occasions in 2021 and 2022, Ms. Meisenbach made a loan payment online and SPS charged her a Pay-to-Pay Fee in the amount of $15.00.

102.    On December 30, 2024, prior to filing this Complaint, Ms. Meisenbach made a written pre-suit demand upon SPS on behalf of similarly situated borrowers, mailing it by first class mail. Specifically, Ms. Meisenbach informed SPS that the additional service fee charged is neither fair nor right and requested that SPS refund the extra fees collected on a class-wide basis. SPS was given a reasonable opportunity to cure the breaches complained of herein but has failed to do so.

103.    Despite receiving this notice, SPS has refused to remedy its violations as to Ms. Meisenbach and Class Members. Further notice would be futile.

**3.      SPS charged Plaintiff Asvitt-Osman Pay-to-Pay Fees.**

104.     Plaintiff Asvitt-Osman owns property in California that is secured by a mortgage and deed of trust, dated June 17, 2002, attached hereto as **Exhibit C**. Plaintiff Asvitt-Osman's

Uniform Mortgage incorporates standard language from Fannie Mae model mortgages and is for her personal residence.

105.    SPS serviced Plaintiff Asvitt-Osman's mortgage during the Class Period.

106.    Ms. Asvitt-Osman made her mortgage payments to SPS online. When she did so, SPS charged her a Pay-to-Pay Fee. For example, on February 14, 2022, SPS charged Ms. Asvitt-Osman a $15.00 Pay-to-Pay Fee for paying her loan online.

107.    On December 30, 2024, prior to filing this Complaint, Ms. Asvitt-Osman made a written pre-suit demand upon SPS on behalf of similarly situated borrowers, mailing it by first class mail. Specifically, Ms. Asvitt-Osman informed SPS that the additional service fee charged is neither fair nor right and requested that SPS refund the extra fees collected on a class-wide basis. SPS was given a reasonable opportunity to cure the breaches complained of herein but has failed to do so.

108.    Despite receiving this notice, SPS has refused to remedy its violations as to Ms. Asvitt-Osman and Class Members. Further notice would be futile.

## V.    TOLLING

109.    Equitable tolling applies to Plaintiffs' and Class Members' claims to the extent SPS misrepresented and concealed the true nature of the fees charged to Plaintiffs' and Class Members' mortgage accounts.

110.    Because Plaintiffs are members of the California Class defined in *DeSimone v. SPS*, 1:20-cv-03837 (E.D.N.Y.), tolling applies to Plaintiffs' and Class Members' claims—all of which mirror the *DeSimone* Plaintiffs' breach of contract and plaintiff Washington's Rosenthal Act and California UCL claims under *American Pipe Tolling* class action tolling principles. *See American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).

## VI.    CLASS ACTION ALLEGATIONS

111.    Plaintiffs Castorina, Meisenbach, and Asvitt-Osman bring this action pursuant to Federal Rule of Civil Procedure, Rule 23(a), 23(b)(2), and (b)(3) on behalf of a Class defined as follows:

> **Class:** All persons (1) with a residential mortgage loan securing a property in California, (2) serviced or subserviced by SPS, (3) with mortgage or deed of trust incorporating standard uniform covenants from Fannie Mae/Freddie Mac, FHA or similar government-backed model mortgages, (4) and who paid an "EZ Pay Fee" or any other fee to SPS for making a loan payment by telephone, an IVR, or the internet, during the applicable statutes of limitations through the date a class is certified, (5) in connection with a payment made after the due date.

112.    Excluded from the Class is SPS, any entity in which SPS has or had a controlling interest or which have or had a controlling interest in any SPS, SPS's employees, officers, directors, legal representatives, assigns, and successors; the judicial officer(s) to whom this matter is assigned and their immediate family; and Class Members who timely opt-out of any certified 23(b)(3) opt-out Class.

113.    Plaintiffs reserve the right to modify or amend the definition of the Class before the Court determines whether certification is appropriate.

### A.    Numerosity (Rule 23(a)(1))

114.    The proposed Class is so numerous that joinder of all members would be impracticable; SPS services hundreds of thousands of loans. The individual Class Members are ascertainable, as the names and addresses of all Class Members can be identified in the business records maintained by SPS. The precise number of Class Members can be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually. Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**B.      Commonality (Rule 23(a)(2))**

115.    There are core questions of law and fact that are common to Plaintiffs' and Class Members' claims.

116.    These common questions predominate over any questions that go particularly to any individual member of the Class. Among such common questions of law and fact are the following:

  a.      whether Class Members' loan agreements prohibited Pay-to-Pay Fees;

  b.      whether SPS was in near or functional privity or privity of contract with Class Members;

  c.      whether SPS was operating as an agent for its lender / note holder / trustee principals;

  d.      whether SPS charged Class Members Pay-to-Pay Fees;

  e.      whether the Pay-to-Pay Fees were in excess of the actual cost of the fees, *i.e.*, the costs and charges incurred by SPS to accept mortgage payments by ACH;

  f.      whether SPS breached Class Members' loan agreements and violated state laws;

  g.      whether SPS's cost to process Pay-to-Pay Transactions is less than the amount that it charged for Pay-to-Pay Fees;

  h.      Whether Plaintiffs and the Class Members were damaged by SPS's conduct;

  i.      Whether Plaintiffs and Class Members are entitled to restitution;

  j.      Whether Plaintiffs and Class Members are entitled to attorneys' fees and costs; and

  k.      the appropriate remedies due by SPS to Class Members.

C.    **Typicality (Rule 23(a)(3))**

117.    Plaintiffs are members of the Class they seek to represent. Plaintiffs' claims are typical of claims of the other Class Members because of the similarity, uniformity, and common purpose of SPS's unlawful conduct. Each Class Member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of SPS's unlawful conduct.

D.    **Adequacy of Representation (Rules 23(a)(4) and 23(g))**

118.    Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent them. There is no hostility between Plaintiffs and the unnamed Class Members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

119.    To prosecute this case, Plaintiffs have chosen the undersigned law firms, who are experienced in class action litigation, fraud litigation, and mortgage litigation, and who have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

E.    **Predominance and Superiority (Fed. R. Civ. P. 23(b)(3))**

120.    The questions of law or fact common to Plaintiffs and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiffs and the unnamed Class Members are based on SPS's common fraudulent and unlawful conduct based on uniform policies involving uniform (and form) mortgage documents.

121.    Moreover, common questions of law predominate, including whether the assessment of Pay-to-Pay Fees violates the mortgage agreements and are assessed in bad faith.

122.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even though some individualized damages determinations may be necessary.

123.    A class action is superior to individual actions.

124.    Joinder of all Class Members would create extreme hardship and inconvenience for the affected borrowers as they are dispersed geographically and reside across multiple states.

125.    Individual claims by Class Members are impractical because the costs to pursue individual claims exceed the value of what any one Class Member has at stake. As a result, individual Class Members have no interest in prosecuting and controlling separate actions.

126.    There are no known individual Class Members who are interested in individually controlling the prosecution of separate actions.

127.    The interests of justice will be well served by resolving the common disputes of potential Class Members in one forum. Individual suits would not be cost effective or economically maintainable, and the action is manageable as a class action.

**F.    Requirements of Fed. R. Civ. P. 23(b)(2)**

128.    Prosecuting separate actions by or against individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party opposing the Class.

129.    SPS acted or failed to act in a manner generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT**
**(On Behalf of all Plaintiffs and the Class)**

130.    Plaintiffs repeat and reallege each preceding paragraph of this Complaint as if fully set forth herein.

131.    The Rosenthal Act applies to SPS because SPS regularly engages in debt collection as defined by the statute. Cal. Civ. Code § 1788.2.

132.    SPS knew that the Pay-to-Pay Fees were not expressly set out in Plaintiffs' standard mortgage and deed of trust agreements, nor the agreements of the Class Members, yet it collected them anyway.

133.    The Rosenthal Act prohibits "collecting or attempting to collect from the debtor the whole or any part of the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector in the collection of the consumer debt, except as permitted by law." Cal. Civ. Code § 1788.14.

134.    When SPS collected Pay-to-Pay Fees from Plaintiffs and the Class Members, it collected (or attempted to collect) fees or charges for services rendered that were not permitted by any law. This conduct violated the Rosenthal Act.

135.    The deeds of trust of Plaintiffs and the Class Members do not expressly authorize SPS to collect Pay-to-Pay Fees. At most, the Uniform Mortgages permit SPS to collect the actual amount disbursed to process the Pay-to-Pay Transactions.

136.    Although the deeds of trust of Plaintiffs and the Class Members do not expressly authorize collection of Pay-to-Pay Fees, SPS collected such fees anyway.

137.    Plaintiffs and the Class Members were harmed when SPS violated the Rosenthal Act through the above-described conduct.

138.    As a result of each and every violation of the Rosenthal Act, Plaintiffs and the Class Members are entitled to any actual damages pursuant to Cal. Civ. Code § 1788.30(a); statutory damages for a knowing or willful violation, pursuant to Cal. Civ. Code §§ 1788.30(b) and 1788.32, to the full extent provided by law; and reasonable attorneys' fees and costs under Cal. Civ. Code § 1788.30(c).

## SECOND CAUSE OF ACTION
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### (On Behalf of Plaintiffs and the Class)

139.    Plaintiffs repeat and reallege each preceding paragraph of this Complaint as if fully set forth herein.

140.    The California Unfair Competition Law "UCL" defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

141.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

142.    SPS's conduct violates the Rosenthal Act. These violations are sufficient to support Plaintiffs' and the Class's claim under the unlawful prong of the UCL.

143.    The Rosenthal Act applies to SPS because it regularly engages in debt collection as defined by the statute. Cal. Civ. Code § 1788.2.

144.    SPS knew that the Pay-to-Pay Fees were not expressly set out in Plaintiffs' deeds of trust or the deeds of trust of the other Class Members, yet it collected them anyway.

145.    The Rosenthal Act prohibits "collecting or attempting to collect from the debtor the whole or any part of the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector in the collection of the consumer debt, except as permitted by law." Cal. Civ. Code § 1788.14.

146.    When SPS collected Pay-to-Pay Fees from Plaintiffs and the Class Members, it collected (or attempted to collect) fees or charges for services rendered that were not permitted by law. This conduct violated the Rosenthal Act.

147.    The deeds of trust of Plaintiffs and the Class Members do not expressly authorize SPS to collect Pay-to-Pay Fees. At most, the Uniform Mortgages permit SPS to collect the actual amount disbursed to process the Pay-to-Pay Transactions.

148.    Although the deeds of trust of Plaintiffs and the Class Members do not expressly authorize collection of Pay-to-Pay Fees, SPS collected such fees anyway.

149.    As a result of the above conduct, Plaintiffs and the Class have suffered economic injury, and SPS has been unjustly enriched at their expense. SPS has been unjustly enriched by obtaining revenues and profits that it would not have obtained absent its unlawful conduct.

150.    Through its unlawful acts and practices, SPS has improperly obtained money from Plaintiffs and the Class Members. As such, Plaintiffs request that the Court cause SPS to restore the money to Plaintiffs and the Class and enjoin SPS from continuing to violate the Rosenthal Act and California's UCL. Plaintiffs' mortgages continue to be serviced by SPS, and they intend to make mortgage payments over the phone and online in the future. Absent an injunction, Plaintiffs and the Class Members may be irreparably harmed and/or denied an effective and complete remedy.

### THIRD CAUSE OF ACTION
### BREACH OF CONTRACT
### (On Behalf of All Plaintiffs and the Class)

151.    Plaintiffs repeat and reallege each preceding paragraph of this Complaint as if fully set forth herein.

152.    Plaintiffs and the other Class Members have executed Uniform Mortgages for loans serviced or subserviced by SPS.

153.    In cases where SPS purchased the loans or servicing rights and/or took assignment of those loans or servicing obligations under the mortgage or deed of trust agreements, SPS is in privity with the borrowers.

154.    In cases where SPS services the loans as an agent for the lender/primary servicer or GSE, SPS is in functional privity or near privity of contract with Plaintiffs and Class Members as a result of its fulfillment of its principals' duties and obligations running from Plaintiffs' and Class Members' loan agreements, including but not limited to: (i) the collection of all monies due under those loan agreements; (ii) preparing and transmitting monthly statements concerning those loan agreements; (iii) performing all or nearly all customer service functions concerning those loan agreements; (iv) engaging in written and oral communications concerning those loan agreements; and (v) enforcing their principals' rights of foreclosure under the loan agreements.

155.    SPS breached the terms of the Uniform Mortgages by imposing Pay-to-Pay Fees on Plaintiffs and the Class Members, which fees are not authorized or permitted by Plaintiffs' and any Class Members' Uniform Mortgages.

156.    The GSEs restricts the fees that SPS may collect under the assignment through the Guidelines. The Guidelines prohibit any fee for "facilitating routine borrower collections." Even if any fee may be charged, SPS may only collect a fee for "special services" and the Guidelines require SPS to keep written policies concerning how the amount of the fee relates to the actual cost of providing the service. SPS's Pay-to-Pay Fees do not relate to the actual cost of SPS providing the Pay-to-Pay service. Moreover, the Guidelines are, at most, a private term between the GSEs and SPS; they are not applicable law nor a contract creating the debt, and do not bind borrowers.

157.    By imposing and charging Pay-to-Pay Fees that are not expressly authorized by Plaintiffs' and Class Members' standard mortgage or deed of trust agreements, SPS violated the applicable laws of the United States and state law, including but not limited to the laws of California. Accordingly, SPS breached Sections 14 and 16 of Plaintiffs Meisenbach's and Asvitt-Osman's Uniform Mortgages by failing to comply with "Applicable Law" in servicing the

mortgages, which includes the law of the states in which the property is located. *See* Exs. B and C.

158.    SPS further breached the aforementioned Sections of Plaintiffs Meisenbach's and Asvitt-Osman's and the Class's Uniform Mortgages, by imposing and charging Pay-to-Pay Fees which are not expressly authorized by Plaintiffs' standard mortgages or deed of trust agreements and not reasonably related to the cost of rendering the service and therefore prohibited by California's Rosenthal Act, *see* Cal. Civ. Code § 1788.14(b), compliance with which is incorporated into Plaintiffs' mortgage and deed of trust agreements

159.    Plaintiff Castorina, like many borrowers, has an FHA mortgage, meaning that the mortgage is issued by an FHA-approved lender and insured by the FHA. The uniform covenants of the FHA mortgages state that the lender may only assess fees authorized by the HUD Secretary.

160.    Like other FHA mortgages, the Plaintiff Castorina's Uniform Mortgage states that "Lender may collect fees and charges authorized by the Secretary." Ex. A, ¶ 8.

161.    HUD permits servicers of FHA mortgages to collect "allowable fees and charges," *i.e.*, fees and charges specifically delineated in Appendix 3 to the HUD Single Family Housing Policy Handbook ("Servicing Handbook"). *See* Handbook 4000.1, FHA Single Family Housing Policy Handbook § III(A)(1)(f).

162.    The Handbook does not authorize Pay-to-Pay Fees.

163.    By assessing Pay-to-Pay Fees not "authorized by the Secretary," SPS violated the uniform covenants of Plaintiff Castorina's mortgage agreement.

164.    Plaintiffs and the other Class Members have been damaged as a direct result of SPS's breaches of contract. Those damages comprise the wrongful imposition and collection of Pay-to-Pay Fees from Plaintiffs and Class Members.

165.    Plaintiffs and the other Class Members were each at all relevant times in compliance with and not in breach of their Uniform Mortgages and other loan agreements, or alternatively, SPS elected its remedy to continue to perform under those loan agreements even after asserting a breach by Plaintiffs and other Class Members.

166.    SPS breached "Uniform Covenants" of Plaintiffs' and Class Members' Uniform Mortgages.

167.    As a result of SPS's breaches of contract, Plaintiffs and the Class seek actual damages, equitable remedies including declaratory relief, an injunction, disgorgement, restitution, and imposition of a constructive trust, in addition the payment of attorneys' fees and reasonable expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against SPS as follows:

A.    Certifying the Class pursuant to Federal Rule of Civil Procedure 23, certifying Plaintiffs as the representative of the Class, and designating their counsel as counsel for the Class;

B.    Actual and compensatory damages for injuries suffered by Plaintiffs and Class Members;

C.    Awarding Plaintiffs and Class Members statutory and exemplary damages where permitted;

D.    Awarding Plaintiffs and Class Members restitution and disgorgement where permitted;

E.    Injunctive relief, including, but not limited to, removal of charges incurred by Plaintiffs and Class Members for the Pay-to-Pay Fees;

F.    Reasonable attorneys' fees and costs of this action and pre-judgment interest; and

G.      Such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs and the Class demand a trial by jury on all issues so triable.


Dated:  January 16, 2025                    **TYCKO & ZAVAREEI LLP**

                                            */s/Katherine Aizpuru*
                                            Katherine Aizpuru
                                            Email: kaizpuru@tzlegal.com
                                            Robin Bleiweis (*pro hac vice to be filed*)
                                            Email: rbleiweis@tzlegal.com
                                            2000 Pennsylvania Ave NW, Suite 1010
                                            Washington, D.C. 20006
                                            Tel. (202) 973-0900

                                            **BAILEY & GLASSER LLP**
                                            James L. Kaufman (*pro hac vice to be filed*)
                                            Email: jkaufman@baileyglasser.com
                                            1055 Thomas Jefferson Street NW, Suite 540
                                            Washington, D.C. 20007
                                            Tel. (202) 463-2101

                                            **GISKAN SOLOTAROFF**
                                            **& ANDERSON LLP**
                                            Catherine E. Anderson, Esq.
                                            Email: canderson@gslawny.com
                                            90 Broad Street, 10th Floor
                                            New York, NY 10004
                                            Tel: (212) 847-8315

                                            **LIEFF CABRASER HEIMANN**
                                            **& BERNSTEIN, LLP**
                                            Rachel Geman, Esq.
                                            Email: rgeman@lchb.com
                                            Margaret Becko, Esq.
                                            Email: mbecko@lchb.com
                                            250 Hudson Street, 8th Floor
                                            New York, NY 10013
                                            Tel: (212) 355-9500

**TUSA P.C.**
Joseph S. Tusa, Esq.
Email: joseph.tuspc@gmail.com
P.O. Box 566
55000 Main Road, 2nd Floor
Southold, NY 11971
Tel. (631) 407-5100

*Counsel for Plaintiffs and Proposed Class
Counsel*